UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION AT LEXINGTON

| | |
|---|---|
| **JAMIE GRAY,** | **CIVIL NO. 5:23-CV-112-KKC-MAS** |
| **Plaintiff,** | |
| **V.** | **OPINION AND ORDER** |
| **LISA FARMER, et al.,** | |
| **Defendants.** | |

\*\*\* \*\*\* \*\*\*

This matter is before the Court on the motion for summary judgment (R. 49) filed by the Lexington-Fayette Urban County Government (the "LFUCG") and by Lisa Farmer, who, at the time of the relevant events, was the director of the LFUCG Department of Community Corrections.

## I.    Background

While he was a pretrial detainee at the Fayette County Detention Center, Plaintiff Jamie Gray was sexually assaulted by defendant Joshua Rogers, who was a corrections officer at the detention center. Rogers later pleaded guilty to sodomy in the third degree in relation to the assault and was sentenced to a four-year prison term. (DE 52-3 Rogers Dep. 32-34.)

Gray's complaint identifies the plaintiff as "Jamie Gray" and uses feminine pronouns when referring to the plaintiff. The complaint states that Gray "is a transfeminine woman who was 'assigned male at birth,' but who was taking transitioning hormone therapy at the time of her incarceration." (DE 1 Complaint ¶ 32.) Gray's response brief to the motion for summary judgment, however, refers to Gray as "Jeremy

Gray" and uses masculine pronouns when referring to him explaining that, since filing the complaint, Gray has "abandoned his transition treatment." (DE 52 Response 2.) The Court will follow this lead and use masculine pronouns when referring to Gray. As to the correct name of the plaintiff, however, Gray has never moved to change the name from Jamie to Jeremy. Accordingly, the plaintiff continues to be identified as "Jamie Gray" in the caption of this opinion and on the Court's docket.

Gray asserts claims against Rogers, the LFUCG, and former Director of Community Corrections Lisa Farmer, in both her individual and official capacities.[1] Gray asserts a claim against the LFUCG; Farmer, in her official capacity; and Rogers, in his individual capacity under 42 U.S.C. § 1983, charging that they violated various of his constitutional rights. (DE 1-1 Complaint 11.) While the complaint does not state this claim is asserted against Farmer in her individual capacity, Gray discusses such a claim in his response, and the defendants discuss the claim in their reply. Thus, the Court will analyze a § 1983 claim against Farmer in her individual capacity in this opinion.

Gray also asserts state law negligence claims against Farmer for negligently hiring Rogers and for failing to adequately train or supervise him and for negligently staffing the detention center and deciding where to house Gray while he was detained. While the complaint is not clear, both sides interpret the complaint to assert these claims against Farmer in her individual capacity.

Gray's complaint may also attempt to assert a claim against Farmer for violations of the Prison Rape Elimination Act ("PREA"), Prison Rape Elimination Act of 2003

---

[1] Gray also asserted constitutional claims against Scott Colvin, who is the current director of Community Corrections. Gray asserted claims against Colvin only in his official capacity and sought only prospective injunctive relief. By prior opinion, however, the Court dismissed the claims against Colvin. (DE 48 Feb. 24, 2025 Opinion.)

2

(PREA), 34 U.S.C. § 30301 *et seq*. However, there is no private right of action under
PREA. *See, e.g., Miles v. Mitchell*, No. 3:18-CV-P116-CRS, 2018 WL 5929643, at *5
(W.D. Ky. Nov. 13, 2018) ("PREA creates no private right of action, and to the extent
that Plaintiff may be attempting to bring a claim thereunder, such claim will be dismissed
for failure to state a claim upon which relief may be granted.") In his response, Gray does
not contest that. Accordingly, any PREA claim will be dismissed.

Finally, Gray also asserts various state law claims against Rogers.

The LFUCG and Farmer ask the Court to dismiss all claims against Farmer in her
official capacity and to enter summary judgment in their favor on all other claims
asserted against them.

## II.    Analysis

### A.  Official Capacity Claims against Farmer

The Court will dismiss the official capacity claims against Farmer as redundant.
This is because "[a] suit against an individual 'in his official capacity'" is "essentially a
suit directly against the local government unit." *Leach v. Shelby County Sheriff*, 891 F.2d
1241, 1245 (6th Cir.1989). A § 1983 action "normally should be brought against either or
both of two defendants: the local public official in his individual capacity and the local
government which employs or is sought to be held responsible for the acts of that public
official." *Id*. at 1244-45. "As long as the government entity receives notice and an
opportunity to respond, an official-capacity suit is, in all respects other than name, to be
treated as a suit against the entity." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985).
"There is no longer a need to bring official-capacity actions against local government

3

officials. . . . " *Id.* at 167 n. 14. Here, Gray has sued the LFUCG. Accordingly, his constitutional claims against Farmer in her official capacity will be dismissed.

Likewise, to the extent that Gray asserts state-law claims against Farmer in her official capacity, these are essentially claims against the county. *Commonwealth v. Harris*, 59 S.W.3d 896, 899 (Ky.2001).

Accordingly, all the official capacity claims against Farmer will be dismissed.

### B. Section 1983 Claims against the LFUCG

Gray's asserts constitutional claims under 42 U.S.C. § 1983 against the LFUCG based on Rogers' sexual assault. Gray asserts that the LFUCG should be held liable for the violation of his constitutional rights caused by the assault. (DE 52 Response 9.)

For these claims, in his response, Gray cites the standard set forth in *Westmoreland v. Butler Cnty.*, 29 F.4th 721 (6th Cir. 2022). (DE 52 Response 11). That standard governs liability for an individual officer charged with unconstitutionally failing to protect an inmate from harm. *Id*. at 728-29. Constitutional claims against a municipality like the LFUCG are assessed under a different standard.

The LFUCG can be held liable under § 1983 for Rogers' assault only if "its policy or custom cause[d] the constitutional violation in question." *Miller v. Calhoun Cty*., 408 F.3d 803, 813 (6th Cir. 2005). The LFUCG is liable only for its own actions. It cannot be liable solely because an employee committed a constitutional violation. *Lemaster v. Lawrence Cnty., Kentucky*, 65 F.4th 302, 312 (6th Cir. 2023).

"While a municipality may be held liable under 42 U.S.C. § 1983 for a constitutional violation directly attributable to it, § 1983 does not impose vicarious liability on a municipality for the constitutional torts of its employees." *Stemler v. City of*

*Florence*, 126 F.3d 856, 865 (6th Cir.1997). "[R]ecovery from a municipality is limited to acts. . . which the municipality has officially sanctioned or ordered." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986). The plaintiff must "demonstrate that, through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged." *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 404 (1997). "That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Id.*

A plaintiff can allege an unconstitutional policy or custom in four ways. He can allege:

(1)  the existence of an illegal official policy or legislative enactment;

(2) that an official with final decision making authority ratified illegal actions;

(3)  the existence of a policy of inadequate training or supervision; or

(4)  the existence of a custom of tolerance or acquiescence of federal rights violations.

*Jackson v. City of Cleveland*, 925 F.3d 793, 828 (6th Cir. 2019) (quoting *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013)).

The first two are based on action; the final two are based on inaction. Gray argues that the LFUCG is liable for his injuries because of its inaction and because Farmer, who he argues was a final decision-maker for the LFUCG, ratified Rogers' assault.

As to the LFUCG's inaction, Gray argues that the LFUCG "failed to adopt policies that were necessary to prevent constitutional violations" (DE 52 Response 11); "failed to properly trains its officers" (*Id.* at 17); and "failed to properly hire, supervise,

and discipline its officers." (*Id.* at 20.) Gray argues this inaction caused Rogers to violate his constitutional rights.

Resolving the issues of whether a municipality caused a constitutional violated is "straightforward" when the plaintiff claims that a municipal action itself violates federal law or that the action directed an employee to violate federal law. *Bd. of Cnty. Comm'rs of Bryan Cnty,* 520 U.S. at 404-05. In cases like this, however, where "a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." *Id.* at 405. The plaintiff must show that the municipality had notice that it needed to act to prevent the constitutional violation in question and that it was deliberately indifferent to that need.

A municipality may be liable for "failure to train its employees or to institute a policy to avoid the alleged harm where the need to act 'is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the [municipality] can reasonably be said to have been deliberately indifferent to the need.'" *Heyerman v. Cnty. of Calhoun,* 680 F.3d 642, 648 (6th Cir. 2012) (quoting *City of Canton v. Harris*, 489 U.S. 378, 390 (1989)). Gray argues that the LFUCG is liable for his damages for both these reasons: because it failed to train corrections officials and also because it failed to institute certain policies that would have prevented Rogers from violating Gray's constitutional rights.

The policies that Gray argues that the LFUCG should have adopted were policies that would 1) ensure proper staffing at the detention center (DE 52 Response 11); 2)

6

"ensure that male guards were not left solely in charge of women inmates" (*Id*. 14); 3) require that security cameras be properly placed in the detention center (*Id*. 16); and 4) ensure proper investigation of prior instances of sexual assault at the detention center. (*Id*. 17.)

Plaintiffs can establish a municipality's deliberate indifference to a need to act in two ways. First, the plaintiff "can present evidence showing that the municipality possessed actual knowledge indicating a deficiency with the existing policy or training (or lack thereof), such as where there have been recurring constitutional violations." *Heyerman v. Cnty. of Calhoun*, 680 F.3d 642, 648 (6th Cir. 2012).

Second, where the municipality has not been alerted to the need to act by recurring constitutional violations, the plaintiff can show that the need to act should have been "plainly obvious" to the municipality's policymakers, who, nevertheless, are "deliberately indifferent" to the need." *Id*. at 648-49 (quoting *City of Canton*, 489 U.S. at 390 n. 10). This arises "in a narrow range of circumstances" where a violation of federal rights "may be a highly predictable consequence of the failure to equip law enforcement officers with specific tools to handle recurring situations." *Bd. of Cnty. Comm'rs of Bryan Cnty.*, 520 U.S. at 409. "For example . . . where city policymakers know that their police officers will be required to arrest fleeing felons and have armed the officers with firearms in part to accomplish this task, the need to train the officers in the constitutional limitations on the use of deadly force is 'so obvious,' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights." *Heyerman*, 680 F.3d at 649 (quoting *City of Canton*, 489 U.S. at 390 n. 10).

To prove the LFUCG's actual knowledge that its current policies and training were deficient by way of recurring violations, Gray must point to evidence of a "clear and persistent pattern" of unconstitutional conduct by county employees. *D'Ambrosio v. Marino*, 747 F.3d 378, 387 (6th Cir. 2014).

To prove recurring constitutional violations by corrections officials, Gray points to a spreadsheet attached to his response. (DE 52 Response 4-5 (citing DE 52-9).) The names of the LFUCG agents and employees on the spreadsheet appear to be the same as those on a spreadsheet produced by the LFUCG in response to Gray's interrogatory asking the LFUCG to identify jail officers, agents, and employees accused of sexual assault from 2015 to current.  (DE 42-1 Interrogatory Answers 6 & Attachment.) Both spreadsheets indicate there have been 96 such accusations in the last 10 years.

The spreadsheet produced by the LFUCG, however, lists only accusations of sexual assault against detention center employees. (DE 49-8 Spreadsheet.) It does not indicate whether any officer was determined to have committed the violation. The "number of complaints filed, without more, indicates nothing. People may file a complaint for many reasons, or for no reason at all." *Strauss v. City of Chicago*, 760 F.2d 765, 769 (7th Cir. 1985).

The spreadsheet that Gray attaches to his response states "founded," "unfounded," "substantiated," or "unsubstantiated" next to a brief description of each accusation. (DE 52-9 Spreadsheet.) Gray does not explain, however, where this additional information came from, how it was compiled or who compiled it. The Court has been unable to locate that explanation in the record. Accordingly, the Court cannot consider this chart as evidence of a pattern of sexual assaults like that alleged by Gray.

Further, for an inference that the municipality knew it needed to act to prevent the constitutional violation charged, the pattern of unconstitutional conduct must consist of "similar constitutional violations" to that alleged by the plaintiff. *Connick v. Thompson*, 563 U.S. 51, 62 (2011). "Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Id*. Thus, "[p]rior indications cannot simply be for any and all 'bad' or unwise acts, but rather must point to the specific violation in question." *Estate of Davis ex rel. McCully v. City of N. Richland Hills*, 406 F.3d 375, 383 (5th Cir. 2005).

In *Connick*, the plaintiff Thompson brought a § 1983 claim against a local district attorney's office alleging that it had failed to train its prosecutors properly on their obligation under *Brady v. Maryland*, 373 U.S. 83 (1963) to disclose evidence favorable to the accused. That lack of training, Thompson contended, had resulted in the prosecutors in his case failing to turn over an exculpatory crime lab blood analysis report. In support of that claim, Thompson relied on the fact that, in the ten years preceding his case, four convictions obtained by the defendant's office had been reversed for *Brady* violations. The Supreme Court held, however, that because none of the other four cases "involved failure to disclose blood evidence, a crime lab report, or physical or scientific evidence of any kind," those incidents were "not similar" to Thompson's case and could not have put the defendant on notice that the office's *Brady* training was inadequate with respect to the kind of *Brady* violation alleged by Thompson. *Id*. "In short, the prior examples of wrongdoing must violate the same constitutional rights and violate them in the same way." *Berry v. Delaware Cnty. Sheriff's Off.*, 796 F. App'x 857, 863 (6th Cir. 2019)

Even assuming the reliability of the information on the spreadsheet produced by Gray, it does not provide sufficient information about the incidents from which a jury could infer a pattern of sexual assaults like that alleged by Gray. The spreadsheet states "founded" by 14 of the entries in the spreadsheet in addition to Gray's assault. However, Gray states that he was "brutally sexually assaulted" and "forcibly raped" by Rogers. (DE 52 Response 1, 6.) In his deposition, Gray stated that Rogers forced Gray to perform oral sex on him. (DE 52-2 Gray Dep. 84.) The brief description of the complaints contained in the spreadsheet does not set forth similar accusations.

For example, of the 14 prior "founded" accusations, 9 were against the same official for unclothed searches of the opposite gender. Another "founded" accusation involved comments – no physical contact. Gray does not point to any evidence from which the Court could infer that these 10 instances were similar to the kind of brutal sexual assault he has described. The brief descriptions of the other four "founded" accusations on the chart do not provide sufficient information to infer a pattern of sexual assault like that alleged by Gray.

Further, four incidents over a decade are not sufficient to establish the necessary pattern of unconstitutional conduct from which a jury could infer that the LFUCG was deliberately indifferent to the likelihood that sexual assaults by corrections officials would occur.  *See Ruiz-Bueno v. Scott*, 639 F. App'x 354, 364 (6th Cir. 2016) ("We do not think these ten incidents in the past eighteen years demonstrate a pattern of constitutional violations that satisfies the burden of proving deliberate indifference."); *Bowman v. City of Flint*, No. 21-CV-12845, 2025 WL 848135, at *2 (E.D. Mich. Mar. 18, 2025) (collecting cases); *Hernandez v. Dallas Cnty. Sheriff*, No. 3:23-CV-01583-E,

2024 WL 4202381, at *8 (N.D. Tex. Sept. 16, 2024) (stating the Fifth Circuit has repeatedly required more than five prior incidents).

Gray also points to a news article regarding an inmate sexually assaulting another inmate. (DE 52-8 WTVQ Article.) This article is not evidence that could be presented to a jury to establish a pattern of unconstitutional conduct. *Turner v. City of Taylor*, 412 F.3d 629, 652 (6th Cir. 2005) ("Because the newspaper article was inadmissible hearsay and Defendants have not conceded its evidentiary reliability, it could not create a genuine issue of material fact for trial.") Regardless, the article does not provide any evidence of the kind of constitutional violation Gray alleges: sexual assault by a corrections official.

Finally, as evidence of a clear and persistent pattern of sexual assaults, Gray points to a separate federal action filed by plaintiffs Jason Costick and Joey Bardelas, both of whom alleged that they were sexually assaulted by Rogers while detained at the Fayette County Detention Center. *See Costick, et al.v. LFUCG*, No. 5:23-198-GFVT (filed June 29, 2023). Rogers was never adjudged liable in that action. Costick's claims were dismissed by Agreed Order after the parties settled, (*Id*. DE 40), and Bardelas's claims were dismissed after his counsel advised that Bardelas had abandoned them. (*Id*. DE 44.)

Regardless, however, the *Costick* plaintiffs alleged they were assaulted by Rogers on June 16, 2022. (*Id*. DE 1-1 Complaint ¶¶ 35, 38.) Rogers assaulted Gray just two days later, on June 18, 2022. Gray points to no evidence that the LFUCG became aware of Costick's and Bardelas's allegations prior to Gray's assault. During the LFUCG internal investigation of the Bardelas/Costick allegations, both Costick and Bardelas indicated that they filed their complaints with the LFUCG only after seeing a news story about

11

Gray's assault. (DE 55-1 Costick Investigation Notes 1-2, 4; DE 55-2 Bardelas Investigation Notes 4.) The Bardelas investigation notes indicate that he made his complaint on June 29, 2022. (DE 55-2 Bardelas Investigation Notes 4.) Thus, the LFUCG could not have had notice of the Bardelas/Costick claims until after Gray's assault. Those claims could not have served as notice to the LFUCG of its "need to act" before Rogers assaulted Gray.

To prove LFUCG's actual knowledge that its current policies and training were deficient by way of a single violation, Gray must point to evidence from which it could be inferred that sexual assault of an inmate was a "highly predictable" consequence of the government's failure to act. Again, liability is found this way only in a "narrow range of circumstances." *Bd. of Cnty. Comm'rs of Bryan Cnty.*, 520 U.S. at 409.

Sexual assault is illegal. Thus, without evidence of a prior pattern of sexual assaults by corrections officials, a jury could not infer that such assaults were "highly predictable" in the absence of specific training. "If the threat of prison time does not sufficiently deter sexual assault, it is not plausible to assume that a specific instruction not to commit sexual assault will provide such deterrence, and therefore failure to include such instruction does not constitute deliberate indifference absent a longstanding pattern of such criminal behavior." *Flores v. Cnty. of Los Angeles*, 758 F.3d 1154, 1160 (9th Cir. 2014); *see also Barney v. Pulsipher*, 143 F.3d 1299, 1308 (10th Cir. 1998) ("Even if the courses concerning gender issues and inmates' rights were less than adequate, we are not persuaded that a plainly obvious consequence of a deficient training program would be the sexual assault of inmates. Specific or extensive training hardly seems necessary for a jailer to know that sexually assaulting inmates is inappropriate behavior."); *Andrews v.*

12

*Fowler*, 98 F.3d 1069, 1077 (8th Cir. 1996) ("In light of the regular law enforcement duties of a police officer, we cannot conclude that there was a patently obvious need for the city to specifically train officers not to rape young women.")

In *Canton*, in discussing the single-violation theory for municipal liability, the Supreme Court gave the example of a city that arms its officers with firearms with the expectation that they will have to arrest fleeing felons. Failure to train those officers in excessive force is "so obvious" that a failure to do so could be deemed "deliberate indifference" even without a pattern of excessive force violations. *City of Canton*, 489 U.S. 390 n. 10. This is because, "[t]here is no reason to assume that police academy applicants are familiar with the constitutional constraints on the use of deadly force . . . Under those circumstances there is an obvious need for some form of training." *Connick*, 563 U.S. at 64.

In contrast, there is every reason to assume that prosecutors are familiar with their obligations under *Brady* without the need for in-house training, *Id*.at 66-67; that police academy applicants are familiar with the criminal prohibition on sexual assault, *Flores*, 758 F.3d at 1160; and that corrections officers are familiar with the same criminal prohibition.

Moreover, the LFUCG cannot be liable for failure to train corrections officers on the prohibition on sexual assault of inmates because there is no dispute that it did provide training to all corrections officers. The LFUCG has produced evidence that recruits are trained on sexual abuse, gender identity, and PREA. Corrections officers then receive annual training on PREA; types of sexual behavior and relationships encountered in custody settings; and the types of potential offenses and consequences of those offenses.

(DE 49-8 Interrog. Answers 2.) In his response, Gray states there is no evidence that Rogers received this training, but Rogers testified that he received PREA training and was instructed that corrections officials could not have any sexual contact with an inmate because inmates "legally can't consent." (DE 49-2 Rogers 10-11, 45.) Gray points out that Rogers testified that, after the incident, "he never thought about any of that." (*Id*. at 29.) Regardless of whether Rogers thought about his training, Rogers testified that he received training and was instructed that even consensual sex with an inmate was illegal. Gray does not identify what additional training would have stopped Rogers from assaulting him.

 Gray does not allege that the LFUCG is liable for Rogers' conduct only because it failed to act to prevent it. He also alleges that the LFUCG is liable for Rogers' sexual assault because Farmer had final decision-making authority for the LFUCG and "ratified" the illegal act. If "authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final policy." *Feliciano v. City of Cleveland*, 988 F.2d 649, 656 (6th Cir. 1993) (citation omitted).

There are two problems with this argument. First, Gray points to no evidence that Farmer had final decision-making authority for the LFUCG.  To establish such authority, Gray must point to evidence that Farmer's decisions regarding the detention center were "final and unreviewable" and "not constrained by the official policies of superior officials." *Miller v. Calhoun Cnty*., 408 F.3d 803, 814 (6th Cir. 2005) (citation and internal quotation marks omitted).

14

While Gray points out that Farmer testified she had wide-ranging duties and oversight responsibility at the detention center, he points to no evidence that Farmer established final municipal policy for the LFUCG. Kentucky statutes "suggest that it is the fiscal court of the county that establishes policy and the jailer who carries out these policies." *Johnson v. Hardin Cnty., Ky*., 908 F.2d 1280, 1287 (6th Cir. 1990) (citing Ky. Rev. Stat. §§ 67.080(2)(d) ("The fiscal court shall . . . provide for the incarceration of prisoners according to the provisions of KRS Chapter 441."); 67.083(3)(e); and 441.045(1)). Kentucky state law specifically states that "the county governing body shall prescribe rules for the government, security, safety, and cleanliness of the jail and the comfort and treatment of prisoners, provided such rules are consistent with state law." Ky. Rev. Stat. Ann. § 441.045(1). Citing this provision, the Sixth Circuit determined, "State law contemplates that the authority to promulgate policies for the care of prisoners is not vested in the jailer, but in the fiscal court." *Johnson*, 908 F.2d at 1287. Gray points to no evidence that the director of Community Corrections establishes final policy for the LFUCG.

Secondly, even if Farmer has final decision-making authority to set county policy, Gray has presented no evidence from which it could be inferred that Farmer ratified Rogers' sexual assault. "Ratification requires more than acquiescence – it requires affirmative approval of a particular decision made by a subordinate." *Feliciano*, 988 F.2d at 656. Gray cites no evidence that Farmer affirmatively approved of Rogers' assault.

For all these reasons, the Court will enter summary judgment for the LFUCG on Gray's § 1983 claims against it.

15

### C. Claims against Farmer in her Individual Capacity

As to a constitutional claim against Farmer in her individual capacity, "[s]ection 1983 liability will not be imposed solely upon the basis of respondeat superior." *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984). Gray must present evidence that Farmer "encouraged the specific incident of misconduct or in some other way directly participated in it." *Id*. At a minimum, he must point to evidence that Farmer "at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of" Rogers. *Id*.

Gray does not allege that Farmer directly participated in Rogers' sexual assault or that she encouraged it. Accordingly, to survive summary judgment, he must point to evidence from which a jury could infer that Farmer implicitly authorized, approved of or knowingly acquiesced in the assault. The Sixth Circuit has explained that this showing "requires active unconstitutional conduct by the supervisor because supervisory liability will not attach for a failure to act." *Helphenstine v. Lewis Cnty., Kentucky*, 60 F.4th 305, 321 (6th Cir. 2023), *cert. denied*, 144 S. Ct. 692 (2024). Gray's constitutional claim against Farmer rests entirely on her alleged inaction. He argues that Farmer is liable for Rogers' assault because she "did not bother to implement PREA protocols"; did not prohibit one-on-one supervision of transwomen by male guards; and failed to adequately staff the detention center. (DE 52 Response 22.)

Moreover, Farmer cannot be liable under § 1983 merely for being "sloppy, reckless, or neglectful" in performing her duties. *Doe v. Claiborne Cnty., Tenn. By & Through Claiborne Cnty. Bd. of Educ.*, 103 F.3d 495, 513 (6th Cir. 1996). In *Claiborne¸* the Sixth Circuit stated that a plaintiff seeking to hold a supervisor liable for the

unconstitutional act of a subordinate must point to evidence that the supervisor knew that the subordinate "showed a strong likelihood" that he would commit the constitutional violation, and the supervisor failed to take adequate precautions. *Id*. Gray points to no such evidence that Farmer had any knowledge that Rogers showed a strong likelihood that he would sexually assault an inmate before he assaulted Gray.

Finally, Farmer cannot be liable in her individual capacity under § 1983 for a failure to train detention center staff. Such a claim "improperly conflates a § 1983 claim of individual supervisory liability with one of municipal liability." *Harvey v. Campbell Cnty., Tenn*., 453 F. App'x 557, 563 (6th Cir. 2011) (quoting *Phillips v. Roane Cnty., Tenn*., 534 F.3d 531, 543 (6th Cir. 2008)). Thus, even if Gray could produce evidence that Farmer was a county decisionmaker and was deliberately indifferent to the need for officer training in a particular area, "[she] would be liable, if at all, in [her] official capacity, i.e., rendering [the LFUCG] liable." *Id*.

Accordingly, Gray's constitutional claims against Farmer in her individual capacity must be dismissed.

Likewise, Gray's state law claims against Farmer in her individual capacity for negligence fail. First, Farmer is entitled to qualified immunity for these claims. When government officials and employees are sued in the individual capacity, they are immune from damages for "good faith judgment calls made in a legally uncertain environment." *Yanero v. Davis*, 65 S.W.3d 510, 522 (Ky. 2001). This immunity applies to negligent performance of 1) discretionary acts or functions; 2) performed in good faith; and 3) within the scope of the employee's authority. *Id*. Qualified immunity protects government officials and employees from liability for "bad guesses in gray areas."

17

*Rowan Cnty. v. Sloas*, 201 S.W.3d 469, 475 (Ky. 2006) (citation omitted). It protects "all but the plainly incompetent and those who knowingly violate the law." *Id.* (citation omitted).

Discretionary duties involve "the exercise of discretion and judgment, or personal deliberation, decision, and judgment." *Id*. at 477 (citation omitted). Such duties:

> necessarily require the exercise of reason in the adaptation of a means to an end, and discretion in determining how or whether the act shall be done or the course pursued. Discretion in the manner of the performance of an act arises when the act may be performed in one of two or more ways, either of which would be lawful, and where it is left to the will or judgment of the performer to determine in which way it shall be performed.

*Id*. (citation omitted).

In contrast, an act is ministerial if it "requires only obedience to the orders of others, or when the officer's duty is absolute, certain, and imperative, involving merely execution of a specific act arising from fixed and designated facts." *Id*. at 478 (citation omitted). "Historically, public officers and employees have always been liable in tort for the negligent performance or nonperformance of the ministerial duties of their offices." *Yanero*, 65 S.W.3d at 522.

Gray does not argue that Farmer failed to execute or negligently executed certain and absolute orders or failed to take a specific act or negligently performed an act required by certain fixed and designated facts. Gray indicates in his response brief that his negligence claim against Farmer is based on the supervision, retention, and hiring of Rogers. (DE 52 Response 22.) In his complaint, Gray indicates this claim is also based on Farmer's decisions about where to house Gray while he was in custody and the measures taken to adequately provide security at the detention center and to train Rogers. (DE 1-1

18

Complaint ¶¶ 81-88.) Deciding staffing and security measures, where to house inmates, how to investigate applicants, who to hire, and how to train and supervise staff are all discretionary functions. They can be performed in more than one way. Farmer would have made multiple judgment calls in deciding which course of action to take in each of these tasks.

There is a "narrow exception" to the rule that hiring decisions are discretionary. *Doe v. Magoffin Cnty. Fiscal Ct.*, 174 F. App'x 962, 965 (6th Cir. 2006). In *Yanero*, the Kentucky Supreme Court recognized that public officers, when sued in their individual capacities, have a ministerial duty not to hire an employee that the officer knows is incompetent to perform the task. *Yanero*,65 S.W.3d at 528. Gray has pointed to no evidence that Farmer had any such knowledge about Rogers.

Gray appears to argue that Farmer had a ministerial duty to enforce the Constitution and PREA. (DE 52 Response 24.) The Sixth Circuit has determined that PREA does not provide a specific, mandatory course of action regarding employee supervision or discipline or regarding how to ensure inmate security. *Franklin v. Franklin Cnty., Kentucky*, 115 F.4th 461, 479 (6th Cir. 2024). Thus, these duties are discretionary. *Id*. Gray points to no mandatory courses of action prescribed by the Constitution or PREA that he alleges Farmer negligently failed to perform. Moreover, Farmer cannot be held liable for negligent performance of constitutional duties. *Claiborne Cnty., Tenn*., 103 F.3d at 513.

There is no dispute that decisions about staffing and security measures, where to house inmates, how to investigate applicants, who to hire, and how to train and supervise

staff were all within the scope of Farmer's authority as the director of Community Corrections.

Thus, Gray has the burden of pointing to "direct or circumstantial evidence that the discretionary act was not performed in good faith." *Yanero*, 65 S.W.3d at 523. An official is presumed to have acted in "good faith," absent evidence of "bad faith." *Rowan County*, 201 S.W.3rd at 475. In his response, Gray points to no evidence from which a jury could infer that Farmer acted in bad faith in her housing, staffing, security, hiring, training or supervising decisions.

Moreover, even if Farmer were not entitled to qualified immunity, the negligence claims against Farmer must be dismissed because they fail on the merits. In order to prove negligence, a plaintiff must satisfy three elements: 1) that a defendant owed a duty to the plaintiff; 2) that the defendant breached that duty; and 3) that injury resulted from the breach of that duty. *Pathways, Inc. v. Hammons*, 113 S.W.3d 85, 88 (Ky.2003).

Even assuming a breach of duty by Farmer, Gray has produced no evidence from which a jury could infer that breach caused Rogers, a corrections official, to commit the crime of sexually assaulting an inmate.

As to Gray's claims for negligent hiring and training of Rogers, for these claims, he must point to evidence from which it could be inferred that Farmer "knew or had reason to know of the risk that the employment created." *Carberry v. Golden Hawk Transp. Co.*, 402 S.W.3d 556, 564 (Ky. App. 2013); *Smith v. Norton Hosps., Inc.*, 488 S.W.3d 23, 32 (Ky. App. 2016). Gray has pointed to no evidence from which a jury could infer that Farmer had any reason to know that Rogers posed a risk to the safety to others before his alleged assault of Gray. The evidence shows that, prior to Rogers being hired,

the LFUCG ran a complete background check on Rogers and checked his references, and he passed a pre-employment polygraph test. (DE 49-8 LFUCG Interrog. Answer 3; DE 52-13 Farmer Interrog. Answer 2.) There is no evidence that, after his employment began and before Rogers' assault of Gray, Farmer became aware that Rogers posed any safety risk to inmates. Further, he was placed on leave after Gray's allegations. (DE 52-13 Farmer Interrog. Answer 2.)

Accordingly, the Court will dismiss all state law claims against Farmer, in her individual capacity.

**III.    Conclusion**

For all these reasons, the Court hereby ORDERS that the motion for summary judgment (DE 49) filed by the LFUCG and Lisa Farmer, in her individual and official capacities, is GRANTED as follows:

1)  Gray's claims asserted against Farmer in her official capacity are DISMISSED;

2)  Any claim filed against Farmer in her individual capacity alleging a violation of PREA is DISMISSED;  and

3)  Judgment will be entered in favor of the LFUCG and Farmer, in her individual capacity, on all claims asserted against them under 42 U.S.C. § 1983 and in the favor of Farmer, in her individual capacity, on the state law negligence claims.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

September 26, 2025

KAREN K. CALDWELL
UNITED STATES DISTRICT JUDGE
EASTERN DISTRICT OF KENTUCKY